PIERRE DIONNE

V.

SOUTHEAST FOAM CONVERTING & PACKAGING, INC.

Record No. 891541

September 21, 1990

Present: Carrico, C.J., Compton, Russell, Whiting, Lacy, Hassell, JJ.,
and Poff, Senior Justice

*William F. Stone, Jr.* for appellant.
*John W. Swezey (Swezey & Gautsch*, on brief), for appellee.

SENIOR JUSTICE POFF delivered the opinion of the Court.

Alleging misappropriation of trade secrets and breach of a written agreement not to disclose confidential information, Southeast Foam Converting & Packaging, Inc. (Sefco), filed suit in equity asking the chancellor to enjoin Pierre Dionne (Pierre), a former employee, from "using the processes, techniques, and other secrets learned while an officer of [Sefco] and in violation of his pledge of confidentiality". Pierre filed a motion to dismiss on the grounds that the "Confidential Information Agreement is unenforceable" and that "[t]here is no evidence that there was any trade secret or other confidential information disclosed to Pierre Dionne after the

date of the Agreement." Having heard the evidence *ore tenus*, the chancellor entered a decree granting the injunction "until further order of this Court". Reviewing the facts in the light most favorable to Sefco, we will uphold the chancellor's findings of fact and conclusions of law as stated in his letter opinion.

Robert Dionne, while employed by a corrugated box manufacturer, had developed several new products for use in packaging commodities shipped in commerce. In 1983, Robert created and incorporated Sefco as a family company producing foam products for that purpose. In the company's parking lot one day, he found a board of expanded polystyrene (EPS) which had been crushed beneath the wheels of a truck. Upon examination of the board, brittle in its original form, Robert discovered that the compressed material had become resilient, pliable, and shock-absorbing. Recognizing the potential demand for such a material for packing inside cartons in which furniture and other commodities are transported, he and members of his family began conducting experiments on means and methods of compressing EPS for use in the "inner packaging industry".

Encouraged by what he learned, Robert prepared and forwarded to a patent attorney a description of the process, the product, and its function. A search of the patent records revealed that patents had been issued for 17 foam products made of EPS compressed in different ways for different uses. One of the patents, that for an egg carton, had expired in 1980.

Relying upon the attorney's opinion that Sefco's product did not satisfy the novelty requirement of the patent law, the Dionne family began to focus upon new techniques in the manufacturing process. Two of Robert's sons, Pierre, who had become a full-time Sefco salesman in 1984, and Paul, engaged Mike Harris, a machine shop operator, to build a number of machines designed to facilitate the process and improve the quality of the end product. The brothers required Harris to sign a "non-disclosure" agreement in which he covenanted not to reveal any information about the machines, the manufacturing process, or the product. Employing the new Harris machines and larger hydraulic presses acquired from another source, Sefco made its first sale of compressed EPS to furniture manufacturers in September 1985. The product was sold under the trade name "Durofoam" or "Dur-o-foam".

Robert became terminally ill in 1987, and his wife, Pauline, and their three sons, Paul, Pierre, and Jacques, assumed control and operation of the family business. Robert died in May 1987, and Paul and Pierre renewed their efforts, begun earlier that year, to investigate the possibility of further refinements in the manufacturing process. With the use of a new press designed to create uniform products in mass quantities, they conducted experiments to determine the effects of different levels of pressure applied to blocks of EPS for different periods of time.

Based upon the results of these experiments, Sefco applied for a patent in June 1987. The application identified the product as "Durafoam" and the inventor as Robert Dionne. In a letter she addressed to the patent attorney, Pauline Dionne, who had acquired title to Sefco at Robert's death, asked the attorney "to include Pierre and Paul as co-inventors" because, she wrote, "they discovered a new and improved process of treating EPS for resiliency and enhanced cushioning qualities". Shortly after filing the Durafoam patent application, Sefco, at Pierre's urging, addressed letters to several companies advising them of the pendency of the application and directing them to "cease and desist" selling any product similar to Durafoam.

The research conducted by the family prompted an application for another patent. As explained by Paul, "at about the time we were developing Durafoam we were developing the angle packaging material". This product, he said, was "a paper backing material laminated to the Durafoam" and cut into shapes needed to "wrap around corners or . . . edges of tables, dressers, and nightstands". In January 1988, Pierre applied (in his own name as inventor) for a design patent on this product.

Thereafter, a bitter family quarrel developed. In efforts to restore harmony, the parties agreed that Pierre would assign 90% of his interest in the patent pending on the angle-packaging product to Sefco; that Pauline would give each of the three brothers a 10% share of Sefco; and that all Sefco owners would sign a "Confidential Information Agreement" similar to those Sefco consistently had required all its employees, suppliers, customers, contractors, and other plant visitors to execute. In pertinent part, the agreement Pierre signed provided that

"[i]n consideration of being employed by SEFCO [the subscriber] shall not during, or at any time after the termination

of my employment with the Company, use for myself or others, or disclose or divulge to others any trade secrets, confidential information, or any other data of the Company in violation of this agreement."

Consummation of these agreements failed to resolve the family dispute, and Pierre's employment was terminated in June 1988. Paul testified that, on the day his brother left, Pierre was carrying a brief case. In the presence of state and county police officers, Paul asked him to open it. "He at first did not want to," Paul said, "but then he complied and we opened the brief case and we did find some company documents . . . ." Later, Pauline discovered that the confidentiality agreement signed by Kenneth Clark, a Sefco employee, was missing from his personnel file and that the non-disclosure agreement signed by the machine contractor, Mike Harris, had been removed from the company's safe. Clark testified that, in June 1988, Pierre "told me he tore it up." Mike Harris said that, sometime after Pauline had notified him that he would have to sign a new agreement because the old one was missing, Pierre had paid him a visit and told him that he "didn't have to worry about it" because he, Pierre, "had this confidential agreement in his possession". Pierre acknowledged at trial that he had destroyed those papers.

Witnesses representing several of Sefco's suppliers and customers testified that Pierre had advised them that he planned to commence a new business manufacturing a foam material for use in the inner packaging industry. The new product, he explained, would be named "Flexfoam", and, while it would be similar in quality to Durafoam, it would be manufactured in a "more cost effective" way.

All these witnesses agreed that Durafoam is a product unique in its market area. Even the witness called by Pierre testified, on cross examination, that he knew of no company other than Sefco that had produced a marketable product with the functional qualities of Durafoam.

When the Dionne family learned of Pierre's plans, Sefco filed its bill of complaint: In a letter opinion, the chancellor held that "the manufacture of Durafoam is a trade secret" within the definition of the Uniform Trade Secrets Act, Code §§ 59.1-336 through -343, and that Pierre's conduct constituted a misappropri-

ation within the meaning of the Act.[1] Applying Code § 59.1-337(A) which provides that "[a]ctual or threatened misappropriation may be enjoined", the chancellor entered the injunction Pierre challenges on appeal.

Pierre contends that this two-fold holding is twice flawed. First, pointing to the issuance and expiration of the egg-carton patent as an example, he argues that what is involved is merely an "adaptation of previously known technology to a new product line in a different market" and this, he says, is not a trade secret. That term is defined in the Act, adopted by the General Assembly by Acts 1986, c. 210, in the following language:

"Trade secret" means information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

■■■ Pierre's first contention misapprehends the nature of a trade secret. The crucial characteristic of a trade secret is secrecy rather than novelty. *See generally, Developments in the Law - Competitive Torts*, 77 Harv. L. Rev. 888, 949-50 (1964); Comment, *The Stiffel Doctrine and The Law of Trade Secrets*, 62 Nw.U.L. Rev. 956, 969 (1968). The secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger, if the disclosure is made in confidence, express or implied. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974). Although the subject of a trade secret may be novel in the sense that it is something generally unknown in the trade or business, "[n]ovelty, in the patent law sense, is not required for a trade secret". *Id.* at 476. Indeed, a trade secret "may be a device or process which is clearly anticipated in the prior art or one which is merely a mechanical im-

---

[1] The chancellor also ruled that the confidentiality agreement Pierre signed was legally enforceable and that Pierre had breached that agreement. In the view we take of the issues, we need not consider Pierre's attack on those rulings.

provement that a good mechanic can make." Restatement of Torts § 757 comment b (1939).

■ Summarizing the evidence, the chancellor made a series of factual findings keyed to the several elements of the statutory definition quoted above. Specifically, he found that "the plaintiff has used reasonable security measures designed to maintain the confidentiality of Durafoam"; that "Durafoam has a value and it is generally unknown in the sales area of the plaintiff"; that "[t]he plaintiff has an investment of time, money and effort expended in research and the development of equipment and/or machinery to produce Durafoam"; that "the plaintiff has a competitive advantage in manufacturing and selling Durafoam"; and that "Durafoam is a unique product in said sales area, producing over 80% of the Plaintiff's business."

We hold that the evidence fully supports these findings and that they completely satisfy the statutory definition of the term trade secret.[2] Consequently, we reject Pierre's first contention.

In his second argument, Pierre insists that he cannot be found guilty of misappropriating something which he "personally developed or substantially contributed to developing while employed at SEFCO".[3] We must reject this argument as well.

Pierre relies upon the court's opinion in *Structural Dyn. Res. Corp.* v. *Engineering Mech. R. Corp.*, 401 F. Supp. 1102 (E.D. Mich. 1975). There, the court was asked to decide, among other things, whether employees who had appropriated to their own use trade secrets claimed by their former employer were guilty of an actionable breach of trust. In the course of its opinion, the court weighed competing societal interests. As the court reasoned, the public has an interest in motivating innovation and creativity by placing qualified limits on disclosure of trade secrets, and the public has an interest in preserving the job mobility of workers who have acquired knowledge and skills useful in producing improved consumer products at lower cost. In a common-law analysis, the

---

[2] While we agree that the proponent must bear the burden of proving a trade-secret claim, *see* Annotation *Trade Secrets*, 59 ALR4th 641, 664 (1988), the evidence required is that pertaining to the trade area in which the proponent competes; unlike the standard applicable to an applicant for a patent, the trade-secret proponent is not required to prove its claim nationwide.

[3] At trial, Pierre claimed sole credit for "the idea of compression under time"; Paul said that all three brothers participated in the conduct of tests and that he could not say "who exactly came up with the idea."

court struck the balance in favor of the employees on the ground that they personally had created the subjects of the trade secrets.

■ Pierre's reliance upon this opinion is wholly misplaced. Absent a statute, the weighing process conducted there is a proper judicial function. *See generally*, Annotation, *Skills Acquired in Employment - Use*, 30 ALR3d 631, 636 (1970). However, "it is the responsibility of the legislature, not the judiciary, to formulate public policy, to strike the appropriate balance between competing interests, and to devise standards for implementation." *Wood* v. *Board of Supervisors of Halifax Cty.*, 236 Va. 104, 115, 372 S.E.2d 611, 618 (1988); *accord Morris* v. *Morris*, 238 Va. 578, 588, 385 S.E.2d 858, 864 (1989). Once the legislature has acted, the role of the judiciary "is the narrow one of determining what [the legislature] meant by the words it used in the statute". *Diamond* v. *Chakrabarty*, 447 U.S. 303, 318 (1980). "[T]he contentions now pressed on us should be addressed to the political branches of the Government . . . and not to the courts." *Id.* at 317.

■ By adopting the Uniform Trade Secrets Act, the General Assembly has struck the public-policy balance to be applied by courts in this Commonwealth. In determining whether Pierre is guilty of misappropriation of trade secrets, we look to the words the lawmakers used. Insofar as pertinent here, the act provides:

"Misappropriation means:

. . .

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

. . .

b. At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

. . .

(2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ."

Code § 59.1-336(2)(b)(2).

■ Upon consideration of the testimony and other evidence before him, the chancellor had every reason to conclude, as he did, that the Durafoam process was Sefco's trade secret and that Pierre "knew or had reason to know that his knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use". No member of the Dionne family ever revealed the details of the Durafoam process to anyone except the patent attorney. Unauthorized persons were excluded from the plant. All employees, suppliers, customers, and contractors were required to sign agreements to treat any information they may have acquired as confidential. Each member of the Dionne family, Pierre included, signed such a paper. And it was Pierre himself who prepared and filed an application on behalf of Sefco to convert the trade secret into a patent and then urged Sefco to dispatch "cease and desist" letters to all potential competitors. We agree with the chancellor's conclusions.

Code § 59.1-337(A) provides:

Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

■ Referring to this section of the act, Sefco acknowledges on brief that, when the Durafoam process ceases to be a trade secret, "[Pierre] may petition the Court to modify its earlier order and limit the injunction to only such time as would be a reasonable period of time to eliminate the commercial advantage that has been gained as a result of his misappropriation." For such purposes, the decree entered against Pierre expressly provides that the injunction shall continue "until the further order of this Court".

Accordingly, we will affirm the decree without prejudice to any right Pierre may later acquire under Code § 59.1-337(A).

*Affirmed.*