PRESENT: Hassell, C.J., Lacy, Keenan, Koontz, Kinser, and Lemons, JJ., and Carrico,* S.J.

SHOOTING POINT, L.L.C., ET AL.

v. Record No. 020801

JOHN W. WESCOAT

OPINION BY JUSTICE BARBARA MILANO KEENAN
February 28, 2003

JOHN W. WESCOAT

v. Record No. 020803

SHOOTING POINT, L.L.C., ET AL.

FROM THE CIRCUIT COURT OF NORTHAMPTON COUNTY
Frederick B. Lowe, Judge

In this appeal, we primarily consider whether the chancellor erred in determining the location of an easement and in ruling that the proposed use of the dominant estate as a residential subdivision would not overburden the servient estate.

John W. Wescoat owns a tract of land in Northampton County (the Wescoat parcel) that is subject to a recorded easement in favor of a 176-acre tract owned by Shooting Point, L.L.C. (the Shooting Point parcel). The easement, which is 15 feet wide and 0.3 mile in length, is the only means of ingress and egress between the Shooting Point parcel and a nearby state highway.

---

* Chief Justice Carrico presided and participated in the hearing and decision of this case prior to the effective date of

In response to a plan by Shooting Point, L.L.C. (Shooting Point) to develop its parcel into a residential subdivision, Wescoat filed a bill of complaint alleging, among other things, that Shooting Point's proposed use of its parcel would "impose an additional and unreasonable burden on the easement" over Wescoat's land.

After hearing the evidence ore tenus, the chancellor ruled that use of the Shooting Point parcel as a residential subdivision would not overburden the servient estate. The chancellor also determined that the actual location of the easement was as shown on certain survey plats. Both Wescoat and Shooting Point appeal.

The evidence before the chancellor showed that the Shooting Point parcel is separated from State Highway Route 622 (Route 622) by the Wescoat parcel. The easement, which follows a dirt road over the Wescoat parcel, is located between a field on one side and woods on the other side. The dirt roadway has three 90-degree turns, including two turns that are "blind" where the wooded areas obscure approaching traffic.

In 1974, Wescoat's predecessors in title executed and recorded a written grant of easement establishing the right-of-way. The grant described the location of the easement in the following terms:

his retirement on January 31, 2003.

2

> [S]aid right-of-way easement to follow the present
> road leading from Virginia State Highway Route 622 to
> lands . . . known as Shooting Point Farm, said present
> road running generally in a northerly direction from a
> point in a turn of said Virginia State Highway Route
> 622 to a point at or near a corner of a certain woods,
> thence turning in a generally easterly direction and
> running along the northern edge of said woods to a
> point at or near the edge of said woods, thence
> turning in a generally northerly direction and
> following along the edge of said woods to a point at
> or near a corner of said woods, thence turning in a
> generally easterly direction and running along the
> edge of said woods until the boundary line separating
> Shooting Point Farm from the [Wescoat parcel] is
> reached, at which boundary line the said right-of-way
> easement terminates.

The grant further described the right-of-way as "the only easement to provide a means of ingress and egress" from Route 622 to the Shooting Point parcel. The grant did not contain a clause limiting use of the easement.

At the time the easement was established, both the servient estate and the dominant estate were used primarily for agricultural and recreational purposes. In June 1979, Shooting Point's predecessors in title conveyed 13.2 acres at the southern border of the Shooting Point parcel to Richard E. Meekins, Sr. The deed conveyed to Meekins the right to use the easement as shown on a plat prepared in May 1979 by Bonifant Land Surveys (the Bonifant plat).

In December 1999, Shooting Point purchased the dominant estate and began planning the development of a residential subdivision. The proposed subdivision has 18 residential lots,

3

each averaging over five acres, which border a 50-acre lot to be preserved as "open space."

Shooting Point recorded a plat in the circuit court clerk's office, prepared by Baldwin & Gregg Surveyors (the Gregg plat), that showed the proposed subdivision and the 15-foot-wide easement connecting the Shooting Point parcel to Route 622. The Gregg plat incorporated the Bonifant plat and, in depicting the easement, adopted the Bonifant plat's courses, distances, measuring points, and centerline.

Shooting Point also recorded a declaration of protective covenants that incorporated the Gregg plat, and later used that plat to describe the easement in a deed of trust conveying a subdivision lot to a trustee. Shooting Point conveyed certain other subdivision lots in five separate deeds, each conveying the right to use the easement and referencing the Gregg plat's depiction of the right-of-way.

In January 2000, Wescoat sent a letter to some of the subdivision lot purchasers advising them that the easement was restricted to a width of 15 feet. Wescoat further informed the purchasers that the right-of-way would be "clearly marked" to make them aware of the easement's width. Wescoat's son placed two stakes 15 feet apart at the easement's entrance near Route 622 that straddled the existing usage of the easement. A large

4

sign was placed near the stakes that read, "Begin 15 Foot Right of Way."

In February 2000, Wescoat filed a bill of complaint against Shooting Point alleging that Shooting Point's proposed use of its parcel as a residential subdivision was not reasonable and would create "an additional and unreasonable burden" on the easement. Wescoat asked the chancellor, among other things, to enjoin Shooting Point from selling and conveying the remaining lots in the proposed subdivision.

In January 2001, Wescoat employed George E. Walters, a certified land surveyor, to survey the easement and to place markers delineating its course. After Walters situated the markers on the property, Wescoat's son placed wooden posts outside those markers along the roadway to designate the easement's course. In general, the pathway created by the posts followed the line of the woods more closely than the existing roadway and resulted in "sharper" 90-degree turns.

In February 2001, Wescoat filed a bill of complaint for declaratory judgment against Shooting Point, L.L.C., Shooting Point Property Owners Association, Inc. (collectively, Shooting Point), and others, seeking various rulings concerning Shooting Point's use of its property. The chancellor consolidated Wescoat's two suits for trial.

Before trial, Shooting Point requested leave to file a cross-bill in Wescoat's declaratory judgment suit. In its proposed cross-bill, Shooting Point sought a determination of the easement's location and removal of the posts that Wescoat's son had placed along the course of the easement. The chancellor denied Shooting Point's motion.

Shooting Point also filed a motion in limine to exclude from evidence Walters' testimony and the two revised plats he prepared depicting the easement (the Walters plats) on the ground that this evidence was not timely disclosed. Shooting Point did not receive copies of Walters' revised plats until the day before trial.

In response to the motion in limine, Wescoat noted that no order had been entered regulating discovery in the case, and that Shooting Point also was not timely in its disclosures, having designated an expert witness only the day before trial. The chancellor denied Shooting Point's motion in limine.

On the first day of trial, Wescoat moved the chancellor to continue the case on the ground that the issue of the easement's location was not properly before the court. Shooting Point opposed the motion, arguing that the issue was "directly" before the court. The chancellor denied the continuance motion.

At trial, the chancellor received evidence from expert witnesses indicating that the proposed residential subdivision

6

would generate daily about ten vehicle trips per lot. Thus, the proposed subdivision would result in an additional 180 trips daily over the easement.

Wescoat's son, John W. Wescoat, Jr., testified that vehicles traveling in opposite directions on the easement could not pass at the same location. John stated that the worn roadway remained the same from 1977 to 1999, and that, after Shooting Point purchased its parcel, the traffic on the easement increased and the roadway became wider as motorists drove around "mudholes" in the easement and "cut" corners at the turns in the roadway.

Curtis Jones, Jr., Wescoat's cousin, leased both the Wescoat and Shooting Point parcels for farming purposes. Jones testified that he and his employees make heavy use of the easement when they plant, maintain, irrigate, and harvest the crops.

Wescoat presented the testimony of Walters, who qualified as an expert witness on the subject of land surveying. He testified that the easement was first surveyed in 1979 by P. Bonifant, and that Walters created his plats in an attempt to "resurvey" the easement shown on the Bonifant plat.

Walters stated that he first chose a buried survey pin, or "rebar," that he discovered in the middle of the existing roadway near Route 622 to mark the centerline of the easement,

7

and that he originally used that centerline in his plat to delineate the easement's course. However, after a consultation with Bonifant, Walters later concluded that a " 'bent rebar' marker," located approximately nine feet east of the other "rebar," was the marker indicating the correct location of the easement's centerline. Walters testified that he revised his plats to reflect the "bent rebar" as the centerline of the easement, which resulted in a nine-foot eastward shift of the easement's entrance onto Route 622.

Walters stated that the course designated on his revised plats reproduced the easement as shown on both the Gregg and the Bonifant plats. Walters opined that the present usage of the easement had moved westward since the time of Bonifant's survey and explained that the paths of farm roads "tend to wander" as motorists drive vehicles around potholes and tree limbs that protrude into roadways.

Shooting Point presented the expert testimony of James B. Latimer, II, a licensed land surveyor, who testified that the easement's centerline in the Bonifant plat "is closer to the east, closer to the woods than the physical road that's there." He also stated that the roadway has always been in its present location.

Shooting Point also submitted expert testimony from Millison E. Duff, Jr., a licensed surveyor and president of

8

Baldwin & Gregg Surveyors. Duff stated that the Gregg plat adopted the Bonifant plat's depiction of the easement because that depiction "appeared to follow generally along the road that we had evidence of being in existence at that time."

Duff further testified that the "bent rebar" located about nine feet east of the center of the existing roadway was the survey pin that Bonifant used to mark the easement's centerline. Duff stated that if Bonifant's centerline were followed, the eastern border of the easement would "go right through an 18-inch pine tree," and motorists traveling on the easement would "scrape" the right side of their vehicles against the tree. Duff said that he did not believe that anyone presently could determine the precise location of the roadway in 1974 "short of doing a soils analysis." However, he concluded that the Bonifant plat was the "best evidence" available concerning the easement's location when the Gregg plat was prepared in 1999.

At the conclusion of the evidence, the chancellor held that the Bonifant plat, the Gregg plat, and the Walters plats were the "best evidence" of the easement's location, and that the easement's location was accurately depicted on those plats. The chancellor stated that "[a]ny attempt to establish an alteration [of the designated easement] would simply amount to no more than guesswork or speculation on the part of the Court." The chancellor also held that use of the Shooting Point parcel as a

9

residential subdivision would not overburden the servient estate.

Shooting Point argues that the chancellor erred in denying its motion for leave to file a cross-bill and its motion in limine to exclude Walters' testimony and survey plats. In support of these contentions, Shooting Point advances the same arguments it made before the chancellor. We disagree with Shooting Point's arguments.

The chancellor's rulings on both pretrial motions were proper exercises of his discretion. First, Shooting Point did not need to file a cross-bill to raise the issue of the easement's location, which already was before the court as Shooting Point observed in its opposition to Wescoat's continuance motion. Moreover, the location of the easement was the subject of extensive evidence presented by both parties during trial and is before us in this appeal. Second, the chancellor's ruling denying the motion in limine is supported by the materiality of Walters' testimony and his plats to the issues being tried, and the absence of any order requiring earlier disclosure of discoverable information.

Shooting Point next argues that the chancellor erred in concluding that the Bonifant plat, the Gregg plat, and the Walters plats accurately depict the easement's location. Shooting Point contends that the chancellor improperly ignored

10

evidence of existing usage and established a new easement location.  Shooting Point asserts that a literal application of the Bonifant and Walters plats results in an easement that is unreasonably close to the line of woods, includes a pine tree over 18 inches in diameter, and contains sharp turns that impede the passage of larger vehicles.  We disagree with Shooting Point's arguments.

An established standard of review governs our consideration of both this issue and the issue of the burden placed on the servient estate.  The chancellor, as trier of fact, evaluated the witnesses' testimony and their credibility.  Tauber v. Commonwealth, 263 Va. 520, 526, 562 S.E.2d 118, 120 (2002); Johnson v. Cauley, 262 Va. 40, 44, 546 S.E.2d 681, 684 (2001). Because he heard the evidence ore tenus, the chancellor's decree is entitled to the same weight as a jury verdict.  Chesterfield Meadows Shopping Ctr. Assocs., L.P. v. Smith, 264 Va. 350, 355, 568 S.E.2d 676, 679 (2002); Johnson, 262 Va. at 44, 546 S.E.2d at 684; Hoffman Family, L.L.C. v. Mill Two Assocs. P'ship, 259 Va. 685, 696, 529 S.E.2d 318, 325 (2000).  Thus, on appeal, we will not set aside the chancellor's findings unless they are plainly wrong or without evidence to support them.  Tauber, 263 Va. at 526, 562 S.E.2d at 120; Hudson v. Pillow, 261 Va. 296, 302, 541 S.E.2d 556, 560 (2001).

11

Here, the chancellor received substantial evidence supporting his determination of the easement's location. The Bonifant Plat, the first plat depicting the easement, was prepared only five years after the easement was established. The Gregg plat and the revised Walters plats placed the easement at the same location detailed in the Bonifant plat.

The chancellor's determination also is supported by Shooting Point's own extensive use of the Bonifant plat's location of the easement. Shooting Point implicitly agreed to the accuracy of this location by referring to the Gregg plat in five deeds conveying lots to subdivision purchasers, in one deed of trust, and in Shooting Point's declaration of protective covenants. In addition, Shooting Point's expert, Duff, testified that the Bonifant plat was the "best evidence" available of the easement's location when the Gregg plat was prepared.

We disagree with Shooting Point's assertion that a literal application of these plats incorrectly would place the easement too close to the woods. Although Duff initially testified that the eastern border of the easement, as shown in the plats, would "go right through an 18-inch pine tree," he effectively modified this statement when he later testified that a vehicle traveling on the easement would merely "scrape" its side against the tree. Also, the chancellor received testimony indicating that the path

12

of the worn roadway had "migrated" away from the woods since the time of Bonifant's survey.

We also find no merit in Shooting Point's contention that evidence of existing usage showed that Wescoat consented to a change in the easement's location. We initially observe that, generally, when a fixed location of a granted easement is established, that location may be changed only with the express or implied consent of the persons interested. Buxton v. Murch, 249 Va. 502, 508, 457 S.E.2d 81, 84 (1995); Fairfax County Park Auth. v. Atkisson, 248 Va. 142, 148, 445 S.E.2d 101, 104 (1994); Wagoner v. Jack's Creek Coal Corp., 199 Va. 741, 746, 101 S.E.2d 627, 630 (1958). Thus, in the present case, evidence of existing usage of the easement was competent evidence for the chancellor's consideration.

Here, however, the evidence of usage did not establish consent by Wescoat to a new easement location. Although Curtis Jones, Wescoat's cousin and tenant, sometimes drove his vehicles outside the defined course of the easement as a matter of convenience, his actions did not indicate that Wescoat consented to a different course of the roadway. Similarly, Wescoat's consent cannot be inferred from evidence that after Shooting Point purchased its parcel, the worn pathways in the road widened as motorists drove their vehicles around mud holes and "cut" corners to ease the sharp turns along the roadway.

13

The placement of stakes at the easement entrance, and posts along the course of the easement, also did not establish Wescoat's consent to a different fixed location for the right-of-way. Although Wescoat's letter to the subdivision lot owners advised that the easement would be "clearly marked," only two stakes were placed at the easement's entrance near Route 622. The following month, Wescoat initiated the present suit against Shooting Point.

While some posts later were placed along the course of the worn roadway, the evidence showed that the path marked by the posts generally followed the line of woods more closely than the existing roadway and resulted in "sharper" 90-degree turns. In addition, both Shooting Point and Wescoat disputed that the pathway created by the posts was the true easement location. At trial, Shooting Point asserted that the posts improperly restricted its use of the easement. Wescoat argued that the revised Walters plats, which shifted the easement about nine feet to the east of the posts at the entrance onto Route 622, depicted the correct location of the right-of-way. Thus, we conclude that the record did not establish an express or implied agreement by Wescoat to effect a change in location of the easement, and we hold that the chancellor did not err in his determination of the easement's location.

14

Wescoat assigns error to the chancellor's ruling that Shooting Point's use of its parcel as a residential subdivision would not overburden the servient estate.  Wescoat argues that this use would create an additional burden on his property that would adversely impact his ability to use the easement.  He alternatively contends that even if Shooting Point's use would only result in an increase in degree of the existing burden, that increase would have the practical effect of imposing an additional burden on the servient estate.  We disagree with Wescoat's arguments.

A party alleging that a particular use of an easement is unreasonably burdensome has the burden of proving his allegation.  Shenandoah Acres, Inc. v. D.M. Conner, Inc., 256 Va. 337, 342, 505 S.E.2d 369, 371 (1998); Hayes v. Aquia Marina, Inc., 243 Va. 255, 259, 414 S.E.2d 820, 822 (1992).  Generally, when an easement is created by grant or reservation and the instrument creating the easement does not limit its use, the easement may be used for "any purpose to which the dominant estate may then, or in the future, reasonably be devoted."  Id. at 258, 414 S.E.2d at 822 (quoting Cushman Virginia Corp. v. Barnes, 204 Va. 245, 253, 129 S.E.2d 633, 639 (1963)); see also Collins v. Fuller, 251 Va. 70, 72, 466 S.E.2d 98, 99 (1996).  However, this general rule is subject to the qualification that no use may be made of the easement, different from that

15

established when the easement was created, which imposes an additional burden on the servient estate.  Id.; Hayes, 243 Va. at 258-59, 414 S.E.2d at 822; Cushman, 204 Va. at 253, 129 S.E.2d at 639-40.

In the present case, the 1974 grant did not restrict use of the easement.  Therefore, we consider whether the evidence supports a conclusion that Shooting Point's subdivision of the dominant estate is a reasonable use of the parcel that would not overburden the servient estate.

Our decisions in Hayes and Cushman illustrate the nature of this inquiry.  In Hayes, an operator of a marina on the dominant estate, a 2.58-acre tract, proposed to expand its marina facility from 84 to 280 boat slips.  The easement providing access to the marina was a private roadway about 1,120 feet long and 15 feet wide along its entire course.  The agreement creating the easement did not restrict its use.  243 Va. at 256-59, 414 S.E.2d at 820-22.

We held that the record supported the chancellor's conclusion that the proposed expansion would not unreasonably burden the servient estate, although the "degree of burden" would be increased.  We assumed, without deciding, that an expanded use of a dominant estate could be of such degree as to create an additional burden on a servient estate, but concluded

that the proposed marina expansion was not shown to create such an additional burden.  Id. at 260, 414 S.E.2d at 823.

Similarly, in Cushman, the instrument creating the easement did not contain any language limiting the easement's use.  When the easement was established, the dominant estate, a 126.67-acre tract, had two dwelling houses and was used as a farm.  The owner of the dominant estate proposed to subdivide his land for a residential and commercial development that would include 34 residential lots.  204 Va. at 252-53, 129 S.E.2d at 639-40.

We reversed the chancellor's decree limiting the easement to its original uses, stating:

> The fact that the dominant estate is divided and a portion or portions conveyed away does not, in and of itself, mean that an additional burden is imposed upon the servient estate.  The result may be that the degree of burden is increased, but that is not sufficient to deny use of the right of way to an owner of a portion so conveyed.

Id. at 253, 129 S.E.2d at 640.  Emphasis added.

Applying these principles to the present case, we hold that the subdivision of the 176-acre Shooting Point parcel into 18 residential lots is, in the language of Cushman, a purpose to which the dominant estate may be reasonably devoted.  See id., 129 S.E.2d at 639.  Moreover, the record supports the chancellor's conclusion that Shooting Point's proposed use of the easement would not impose an unreasonable burden on the servient estate.  Although the number of vehicles using the

17

easement would increase substantially as a result of the proposed use, this fact demonstrates only an increase in degree of burden, not an imposition of an additional burden, on the servient estate.  Like the facts underlying our decision in Hayes, the facts here do not support consideration of a further question whether an increased degree of burden could be so great as to impose an additional burden on the servient estate.

For these reasons, we will affirm the chancellor's judgment.

Affirmed.