THOMAS, Judge.
Gary D. Bradshaw, Monica Bradshaw, Robert W. Crumpler, and Betty Crumpler filed a declaratory-judgment action in the Coffee Circuit Court naming Enterprise Realty, Inc., and Enterprise Country Club, Inc. (“the country club”), as defendants and requesting the termination or extin-guishment of an ingress/egress easement across the property owned by the Brad-shaws and abutted by property owned by the Crumplers, which is located in the Creek Pointe subdivision (“the subdivision”). Orwin Lews and Coral Sue Lewis, owners of a lot in the subdivision, intervened in the action. Enterprise Realty and the country club each moved to be dismissed from the action, stating that they had no interest in the easement and denying that they were the dominant-estate owners whose interests the easement served. The trial court denied the motions to dismiss, and the Bradshaws and the Crumplers moved for a summary judgment, which the trial court also denied. After a trial, the trial court entered a judgment determining that the subdivision was the dominant estate served by the easement, dismissing Enterprise Realty and the country club as parties, determining that the easement had not been overburdened, and declining to terminate or extinguish the easement. The Bradshaws and the Crumplers appealed the trial court’s judgment to the Alabama Supreme Court, which transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
The record discloses the following pertinent facts. In 1996, Coffee Developers recorded a plat of the subdivision with the Probate Court of Coffee County. The plat indicated that the subdivision had approximately 100 home lots, named streets, several utility and drainage easements, and a 10-foot-wide ingress/egress easement across Lot 7. The ingress/egress easement across Lot 7 leads to the property owned by Enterprise Realty and upon which the country club operates a country club and golf-course facility.
In 1998, the Lewises purchased Lot 34 in the subdivision. According to Orwin, at the time he purchased Lot 34, no lots *925 abutting the golf course were available for purchase. He explained that he had discussed with Burt Barr, a builder for the subdivision, his desire for access to the golf course. Orwin testified that Barr had explained that the subdivision intended to cater to golfers and that an easement for access to the golf course had been reserved across Lot 7,. which was located near Lot 34. Orwin testified that access to the golf course through the easement was a major consideration in his decision to purchase Lot 34; Coral Sue also testified that the easement had formed part of the basis for their decision to purchase a lot in the subdivision.
Although the easement was not passable for the first few years Orwin owned his home because trees were growing in the easement, Orwin explained that he and others would cross Lot 7 diagonally to access the back of Lot 7, which, at that time, was unimproved, to utilize the rear of the easement. In 2001, Orwin arranged to have the trees blocking the easement cut. He also arranged to have a ramp over the curb installed so the easement could be accessed from the street. At that point, he and others began using the easement for access to the golf course.
The Crumplers own Lot 8, which abuts the easement across Lot 7. They built their home in 2000 and have lived in it since that time. Robert testified that he was aware of the easement when he purchased Lot 8. According to Robert, the easement was not being utilized at the time he purchased Lot 8 and constructed his home. After 2003, however, Robert testified, there had “been a lot of different use” on the easement. Notably, the Crumplers testified that, although Robert was a golfer, he never used the easement to access the golf course but, instead, utilized another route that added less than a minute to the time it took to reach the golf course.
The Crumplers both testified that the use of the easement included not only use by residents of the subdivision but also use by other people from outside the subdivision. They also explained that the easement was not solely utilized by golf carts going to and from the golf course but by bicycles, all-terrain vehicles/four-wheelers (“ATVs”), motorcycles, and even automobiles and trucks. According to the Crum-plers, people on foot, joggers, and people walking their dogs also used the easement. The Crumplers complained that the activity was not confined to the daylight or early evening hours but extended into the nighttime hours, sometimes even so late as to disturb them while they slept. They further testified that the use of the easement caused trash, debris, and dirt to accumulate on their porch and in their back and side yards and that the use of the easement had caused erosion in the easement track that, they said, had caused people to alter their path to cross the Crumplers’ yard, which, in turn, caused damage to or the destruction of their property such as sprinkler heads and outdoor lighting. Finally, the Crumplers complained that some of the people who had used the easement had vandalized their home.
The Bradshaws purchased Lot 7 in 2001 and built a home on the lot in 2002-2003. Both testified that they were aware of the easement when they purchased the lot; in fact, the existence of the easement is contained in their deed. Like the Crumplers, the Bradshaws complained of the use of the easement both day and night and of erosion damage, damage to their driveway and sprinkler heads, an increase in trash and debris along the easement, and the inappropriate use of their backyard as a “short cut” to the easement. In addition, Monica complained that dog *926 walkers allowed dogs to defecate along the path on her property and that people often trespassed in her yard at all hours, citing, as one example, a set of teenagers who she discovered walking in her backyard at 2:30 a.m. Both Gary and Monica testified that, at least five nights per week, the easement was used between 10:00 p.m. and 4:00 a.m., interrupting their “quiet enjoyment” of their property. According to Gary, he had once apprehended a group of teenagers using the easement in the early morning hours; those teenagers had allegedly broken into the country-club clubhouse, stolen liquor, and driven a country-club golf cart into a lake on the golf course. Gary testified that another route to access the golf course was available to the subdivision owners who desired to use the course.[1]
Norris Pfeifer, another resident of the subdivision, testified at the trial. He testified that he had looked at both Lot 7 and Lot 8 when he was looking to purchase a lot in the subdivision. He said that the presence of the easement had resulted in his decision not to purchase either of those lots because he had expected that the use of easement would be an annoyance to the owners of those lots. Pfeifer testified that the subdivision development had been touted as a golfing community and that the easement across Lot 7 was one of the biggest selling points of the subdivision.
David Naumann, who does not reside in the subdivision but owns property abutting the subdivision and the golf course, part of which is located behind Lot 7, testified regarding the use of the easement. He said that he had seen automobiles, motorcycles, trucks, ATVs, bicycles, and skateboards being used on the easement. He indicated that he had presumed that those using the easement in such a manner were not members of the country club. He also noted that the use and misuse of the easement occurred both day and night. According to Naumann, the use of the easement interferes with his quiet enjoyment of his property and poses a threat to his security. Naumann specifically stated that he had no concerns with the drivers of golf carts utilizing the easement.
As noted above, the Bradshaws and the Crumplers desired to terminate or extinguish the easement across the Bradshaws’ property. The trial court refused to do so. In the process, the trial court determined that the dominant-estate owners served by the easement were not Enterprise Realty or the county club but instead were the owners of lots in the subdivision. On appeal, the Bradshaws and the Crumplers take issue with the trial court’s determination as to who are the dominant-estate owners and with the trial court’s failure to extinguish the easement despite what they argue was clear evidence that the ease *927 ment was overburdened. After a consideration of the law governing easements and a review of the evidence and testimony presented at trial, we affirm the judgment of the trial court.
The Bradshaws and the Crumplers first complain that the trial court erred when it determined that Enterprise Realty and the country club were not the dominant-estate owners served by the easement. The way the Bradshaws and the Crumplers view the evidence, the easement benefited the country club because it allowed access to the golf course across the servient estate, i.e., the Bradshaws’ property. Enterprise Realty and the country club view the evidence quite differently. They argue that they receive no benefit, other than an incidental one, from the easement, which, they say, they never requested or bargained for at any time. We agree with the trial court that the dominant-estate owners in the present case are clearly the owners of lots in the subdivision.
To explain our conclusion, we will first discuss the general law governing appurtenant easements.[2] An easement is a property right. Magna, Inc. v. Catranis, 512 So.2d at 913-14.
“ ‘ “A parcel of land benefited by an easement is described as the dominant estate or the dominant tenement. By definition, an easement appurtenant is created for the advantage of the owner of the dominant estate. When an easement is in gross, no dominant estate exists.”
“ ‘Bruce & Ely, The Law of Easements and Licenses in Land, Para. 2.02 (1988). The purpose of appurtenant easements is to benefit the owner of the dominant tenement. 3 Powell on Real Property, 34-21 (1992).’
“Gowen v. Cote, 875 S.W.2d 637, 641 n. 4 (Mo.Ct.App.1994) (emphasis added).”
Weeks v. Wolf Creek Indus., Inc., 941 So.2d 263, 269 (Ala.2006). Put another way, “ ‘[a] dominant estate is the one enjoying the easement, and to which it is attached; the servient estate is the one upon which the easement is imposed.’” Walker v. Clifford, 128 Ala. 67, 74, 29 So. 588, 591 (1901) (quoting Tiedeman an Real Prop. § 497). It matters not whether the dominant estate is a single parcel of land or whether, as here, it is a group of subdivided parcels. Weeks, 941 So.2d at 269-70.
Although the country club might benefit in a tangential or incidental way by having those of its members who happen to live in the subdivision entitled to access the golf course by way of the easement, it is the owners of the subdivided parcels in the subdivision that derive the benefit of being able to cross a neighbor’s property to access the golf course instead of having to take a route around the borders of the subdivision. Thus, we cannot agree with the Bradshaws and the Crumplers that the trial court erred in determining that the subdivision was the dominant estate the easement serves to benefit.[3]
Within their argument that the trial court erred in determining that the *928 subdivision was the dominant estate, the Bradshaws and the Crumplers argue briefly that the trial court also erred in concluding that the owners of parcels in the subdivision had the responsibility to maintain the easement.[4] The Bradshaws and the Crumplers complain that the law does not grant the subdivision owners the right to improve or maintain the easement; however, the authority is to the contrary. Although a servient-estate owner ‘“has ... all the rights and benefits of ownership consistent with the easement [and] the right to use the land remains in him, without any express reservation to that effect, so far as such right does not conflict with the purpose and character of the easement,’ ” he has no duty to maintain the easement. Duke v. Pine Crest Homes, Inc., 358 So.2d 148, 151 (Ala.1978) (quoting 25 Am.Jur.2d Easements and Licenses, § 89) (“ ‘A servient owner ordinarily has no duty to do any positive act with respect to the maintenance or repair of an easement, but he is required to refrain from unlawfully interfering with or obstructing it.’ ”). However, the owner of the dominant estate — or the easement holder — has the right to prepare, maintain, and repair the easement to the extent necessary to secure its use for its intended purpose. See Ellard v. Goodall, 203 Ala. 476, 478, 83 So. 568, 571 (1919) (holding that the owner of an easement for ingress and egress to land to cut timber was entitled to “enter the land, construct and repair the way, break up and level the soil, fill up depressions, blast rocks, remove impediments, and supply deficiencies” in order to perfect and enjoy the easement); see also Annotation, Right of Owner of Easement of Way to Make Improvements or Repairs Thereon, 112 A.L.R. 1303, 1303-04 (1938) (“It is a general rule that the owner of an easement of way may prepare, maintain, improve, or repair the way in a manner and to an extent reasonably calculated to promote the purposes for which it was created or acquired, causing neither an undue burden upon the servient estate, nor an unwarranted interference with the rights of common owners or the independent rights of others.”). Thus, we are not convinced that the trial court erred in determining that the duty to maintain and repair the easement rests with the subdivision owners.
We turn now to the argument from the Bradshaws and the Crumplers that the easement is due to be terminated or extinguished on the ground that it has been overburdened. Our supreme court has explained the law regarding allegations that an easement has been overburdened.
“First, ‘the owner of the servient estate [ordinarily] has the burden of proving overburdening because the servient owner has asserted overburdening as a cause of action or as a reply to a special defense of an easement when the purpose of the easement is not in dispute.’ Zhang v. Omnipoint Communications Enters., Inc., 272 Conn. 627, 640 n. 8, 866 A.2d 588, 596 n. 8 (2005). See also Shooting Point, L.L.C. v. Wescoat, 265 Va. 256, 266, 576 S.E.2d 497, 502 (2003); and Logan v. Brodrick, 29 Wash.App. 796, 800, 631 P.2d 429, 432 (1981).
“Second, as a general rule, an increase in traffic over an easement in the process of normal development of the dominant estate, in and of itself, does not overburden a servient estate. Gutcheon v. Becton, 585 A.2d 818, 822 (Me.1991); Downing House Realty v. *929 Hampe, 127 N.H. 92, 497 A.2d 862 (1985); Shooting Point, L.L.C., 265 Va. at 267, 576 S.E.2d at 503; [Jon W.] Bruce & [James W.] Ely [Jr., The Law of Easments and Licenses in Land ], ¶ 8.03[1]; and Restatement (Third) of Property § 4.10 [ (1995) ], comment f (2000). Ordinarily, to support a finding of overburdening, it must be shown that the use has changed in kind, rather than extent. Shooting Point, L.L.C., 265 Va. at 267, 576 S.E.2d at 503 (an increase in traffic over the servient estate ‘demonstrates only an increase in degree of burden, not an imposition of an additional burden, on the servient estate’). See also Blalock v. Conzelman, 751 So.2d 2 (Ala.1999).
“Relevant factors include evidence of an abrupt or ‘abnormal’ change in the development of the dominant estate and resulting use of the easement. Glenn v. Poole, 12 Mass.App. 292, 295, 423 N.E.2d 1030, 1033 (1981) (‘In the law of easements, a mutation is not within the scope of normal development.’). A relevant showing might also be made of burdens such as ‘(1) decreased property value; (2) increased noise and traffic or interference with the servient owner’s peace and enjoyment of the land; and (3) physical damage to the servient estate.’ Burkhart v. Jacob, 976 P.2d 1046 (Okla.1999). See also Smith v. Fulkroad, 305 Pa.Super. 459, 463, 451 A.2d 738, 740 (1982) (a significant increase in ‘dust, dirt and noise’ was a material factor in determining that there had been ‘a marked transformation in the former peaceful enjoyment’ of the property). Moreover, the use of the easement by owners of property other than a subdivision of the dominant tenement— even property acquired by the dominant-tenement owner after creation of the servitude — overburdens the servient estate as a matter of law. Il Giardino, LLC v. Belle Haven Land Co., 254 Conn. 502, 516, 757 A.2d 1103, 1113 (2000); Bruce & Ely, ¶ 8.03[2]; see also Watson v. Lazy Six Corp., 608 So.2d 389 (Ala.1992); Loveman v. Lay, 271 Ala. 385, 124 So.2d 93 (1960); and McLaughlin v. Selectmen of Amherst, 422 Mass. 359, 664 N.E.2d 786 (1996).
“Third, unless expressly restricted, the use of an easement appurtenant is not limited to the owners of the dominant estate, but also inures to the benefit of their tenants, ‘servants, agents, or employees in conducting [their] business,’ 28A C.J.S. Easements § 164 (1996), as well as social and business invitees, Gowen v. Cote, 875 S.W.2d 637, 641 (Mo.Ct.App.1994); and Picardi v. Zimmiond, 693 N.W.2d 656, 664 (S.D.2005), which includes use by utility workers and ‘utility company service vehicles.’ ”
Weeks, 941 So.2d at 271-72.
The Bradshaws and the Crum-plers argue that they presented uncontro-verted evidence demonstrating that the easement was overburdened. They point to the evidence they provided indicating that the easement was being used by persons who did not live in the subdivision (i.e., trespassers), that vandalism had resulted from the use of the easement, that their property had sustained damage from use of the easement, that the easement had eroded the land, that dirt, trash, and other debris was thrown upon their land by those using the easement, and that the use of the easement at all hours created noise and disrupted their peaceful enjoyment of their respective properties. As explained in Weeks, those facts bear on the determination whether the use of an easement is overburdening the servient estate.
However, those facts — while burdensome annoyances — cannot be con *930 sidered in a vacuum. An easement is, by virtue of its existence and use, a burden to the servient estate. “ ‘ “By definition, an easement appurtenant is created for the advantage of the owner of the dominant estate.” ’ ” Weeks, 941 So.2d at 269 (quoting Gowen v. Cote, 875 S.W.2d 637, 641 n. 4 (Mo.Ct.App.1994), quoting in turn Bruce & Ely, The Law of Easements and Licenses in Land, Para. 2.02 (1988))(emphasis omitted). “‘The purpose of appurtenant easements is to benefit the owner of the dominant tenement.’ ” Id. (quoting Gowen, 875 S.W.2d at 641 n. 4). However, although the easement exists to benefit the dominant estate, “the [estate owners] have concurrent rights to the use of the easement, and neither [estate owner] can prevent the other from using the easement in a manner consistent with the purposes for which the easement was created. Thus, the existence of the easement creates mutual rights and obligations.” Blalock v. Conzelman, 751 So.2d 2, 6 (Ala.1999).
“ ‘[T]he landowner may not, without the consent of the easement holder, unreasonably interfere with the latter’s rights or change the character of the easement so as to make the use thereof significantly more difficult or burdensome.’ Boss v. Rockland Elec. Co., 95 N.J. 33, 38, 468 A.2d 1055, 1058 (1983). Conversely, the easement holder “‘can not change its character, or materially increase the burden upon the servient estate.” ’ White v. Walsh, 105 Cal.App.2d 828, 832, 234 P.2d 276, 278 (1951) (emphasis added) (quoting Burris v. People’s Ditch Co., 104 Cal. 248, 252, 37 P. 922, 923 (1894)). Indeed, ‘it is elementary law respecting easements that neither the dominant owner nor the ser-vient owner is permitted to materially alter the character of the servitude.’ Gerber v. Appel, 164 S.W.2d 225, 228 (Mo.Ct.App.1942) (emphasis added), quashed in part on other grounds, State ex rel. Appel v. Hughes, 351 Mo. 488, 173 S.W.2d 45 (1943).”

Id.

In those Alabama cases actually considering whether an easement has been overburdened, the issue has been whether the dominant-estate owner should be enjoined from using the easement in an overburdening manner. Weeks, 941 So.2d at 271-73 (wherein the servient-estate owner appealed, seeking further limitations on the use of the easement because of alleged overburdening); see also Perdido Place Condo. Owners Ass’n, Inc. v. Bella Luna Condo. Owners Ass’n, Inc., 43 So.3d 1201 (Ala.2009) (wherein the servient-estate owner appealed the trial court’s determination that the use of the easement would not overburden the servient estate and its decision not to “void” the easement). No Alabama case has addressed what the trial court was called on to determine in this case — whether the alleged overburdening of an easement by the dominant-estate owners should result in the termination or extinguishment of the easement. Other jurisdictions have considered the issue and, generally, have decided against the extinguishment or termination of an easement in all but the most egregious cases involving overburdening or misuse of an easement. See, generally, James L. Bu-chwalter, Annotation, What Constitutes, and Remedies for, Misuse of Easement, 111 A.L.R. 5th 313 (2003).
“Misuse of an easement right is not sufficient to constitute a forfeiture, waiver, or abandonment of such right. The right to an easement is not lost by using it in an unauthorized manner or to an unauthorized extent, unless it is impossible to sever the increased burden so as to preserve to the owner of the dominant tenement that to which he is entitled, and impose on the servient ten *931 ement only that burden which was originally imposed upon it.”
Penn Bowling Recreation Ctr. v. Hot Shoppes, Inc., 179 F.2d 64, 66 (D.C.Cir.1949); see also Frenning v. Dow, 544 A.2d 145, 146 (R.I.1988) (“Generally courts have not favored extinguishing an easement unless injunctive relief would be ineffective to relieve the servient [estate].”).
“ ‘Use of an easement for an unauthorized purpose, or the excessive use or misuse of it, is not sufficient to cause a forfeiture of the easement, unless the misuse of the easement is willful and substantial and not merely minor or technical.’ 25 Am.Jur.2d Easements & Licenses § 99 (2007). Instead, other remedies may be used where misuse of an easement has occurred.”
Sluyter v. Hale Fireworks P’ship, 370 Ark. 511, 516, 262 S.W.3d 154, 158 (2007).
In addition, the principle that “courts of equity abhor forfeitures,” which Alabama has long recognized, see McDonough v. Saunders, 201 Ala. 321, 325, 78 So. 160, 165 (1917) (“Courts of equity abhor forfeitures, and will never enforce them unless necessary to enforce the law and to do justice between the parties.”), supports the idea that the property right the dominant-estate owner has in the easement should not be extinguished lightly. See Frenning, 544 A.2d at 146; Parolisi v. Beach Terrace Improvement Ass’n, Inc., 463 A.2d 197, 199 (R.I.1983) (noting the principle and affirming the trial court’s decision not to extinguish an easement pursuant to the terms of the grant for misuse and instead ordering that the easement holder adhere to the restrictions in the grant and install a lock on a gate across the easement to prevent unauthorized use of the easement). Likewise, the fact that it appears that most of the misuse of the easement has been perpetrated by trespassers and vandals militates in favor of a decision not to forfeit the dominant-estate owners’ property rights in the easement. See Cleveland v. Clifford, (No. 02CA008071, March 13, 2003) (Ohio Ct.App.2003) (not reported in N.E.2d) (affirming the trial court’s decision not to extinguish an easement for misuse where it was apparent that the dominant-estate owner, the owner of a restaurant, had not violated the easement and had, in fact, discouraged restaurant patrons from violating the easement, to no avail). Both the Parolisi and the Cleveland cases are instructive. Cleveland indicates that a trial court should consider whether the dominant-estate owner has committed the acts amounting to misuse or has attempted to prevent them when determining whether the easement should be extinguished and Parolisi supports the conclusion that the trial court facing questions regarding overburdening or misuse should balance the equities of the parties to preserve their respective property rights. Parolisi, 463 A.2d at 199; Cleveland, supra.
The dominant-estate owner in Cleveland was the owner of a restaurant that had been granted a “drive easement” by the servient-estate owner. The patrons of the restaurant often parked in the area of the drive easement despite the fact that the owner of the restaurant had informed restaurant patrons not to park in that area. Because the restaurant owner had not himself parked in the drive easement, the court noted that he had not intentionally violated the easement. However, the court pointed out that other steps could be taken to prevent misuse of the easement, including posting “No Parking” signs or painting similar markings on the ground or clearly marking parking spaces around the restaurant.
In Parolisi, the dominant-estate owner was the Beach Terrace Improvement Association, which had a beach-access ease *932 ment across Parolisi’s property. Parolisi, 463 A.2d at 197. The deed conveying the easement contained a restriction requiring that the easement be used for ingress and egress by the Association’s members only; the deed further provided that if the restriction was violated, the Association would deed the easement back to servient-estate owner. Id. at 198. Parolisi objected to the use of the beach access by: nonmembers of the Association like children attending a swim class put on by the town’s recreation department, guests of the Association’s members, shellfíshermen, “boisterous youngsters who made themselves heard at 11 p.m.,” and an unidentified local police officer and his child or children. Id. The Association had, before this action, erected a gate across the easement, posted a sign indicating that the easement was only for the use of Association members, and enacted a rule that the easement could not be used between the hours of 10 p.m. and 6 a.m. Id. at 199. The trial court declined to require that the Association deed the easement back to Parolisi and instead ordered the Association to abide by the restrictions in the deed and to install a lock on the gate and issue keys only to Association members to use when accessing the easement. Id. The appellate court affirmed the trial court’s judgment, noting that by its injunction it had “fashioned ... a model of the proper balancing of the equities.” Id.
Turning back to the present case, even assuming, without deciding, that the use of the easement at all hours, the use of the easement by vehicles other than golf carts, the trash, noise, and associated interference with the use and enjoyment of the servient estate, and the use by trespassers and vandals overburden the servient estate, we are not convinced that the trial court erred in refusing to terminate or extinguish the easement. The evidence did not clearly establish that the misuse of the easement was committed by subdivision owners using the easement for its intended purpose. The Bradshaws and the Crumplers had taken no steps to ameliorate the issues that gave rise to this litigation, like installing fencing or other barriers to prevent access to their properties by unauthorized users or to clearly demarcate the boundaries of the easement or requesting that the subdivision post signs limiting access to the easement to golf carts or subdivision owners or that the subdivision limit the times the easement may be used. In addition, the Bradshaws and the Crumplers actively prevented the improvement of the easement to prevent further erosion. The trial court properly determined that “the [subdivision] owners shall not be denied the benefit and use of the easement because of illegal use of the easement by trespassers, vandals or troublemakers.” Therefore, we affirm its decision to deny the requested extinguishment of the easement.
AFFIRMED.'
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.

. To the extent the Bradshaws and the Crum-plers rely on the fact that an alternate route to access the golf course exists, we note that, because the easement is not an easement by necessity, the existence of that alternate route is irrelevant and cannot be used to compel a relinquishment of the subdivision owners’ property rights in the easement. Magna, Inc. v. Catranis, 512 So.2d 912, 914 (Ala.1987) (lack of need of entirety of easement irrelevant to determination of whether the servient-estate owner could lease a portion of the easement to another party); see also Ex parte Folsom, 42 So.3d 732, 739 (Ala.2009). As our supreme court has explained:
"Our respect for property rights will not permit us to dimmish or reduce Magna’s rights simply because neither Magna nor its tenant needs all the property to which it has property rights. Certainly, our federal and state constitutions protect such rights and would prohibit judicial deprivation or diminution of such rights based solely upon a judicial determination of an owner’s lack of need for such property. The implications of a contrary result would be frightening.”
Magna, 512 So.2d at 914.

. The Bradshaws, the Crumplers, and the Lewises all agree the easement is an easement appurtenant, which appears to be the case. In any event, because the parties do not argue that the easement is an easement in gross, we will analyze the case under the law governing appurtenant easements.

. Because we have concluded that the trial court did not err in determining that the subdivision was the dominant estate, we will not discuss the argument advanced by the Bradshaws and the Crumplers in their brief that the doctrine of merger somehow extinguished the easement because Enterprise Realty and the country club admitted that they had no interest in the easement.

. Notably, the Bradshaws and the Crumplers, in contravention of Rule 28(a)(10), Ala. R.App. P., present no authority for their statements that the trial court’s conclusion is not supported by the law governing easements.